UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

In re

Bridge Construction Services of          12cv3536 (JGK)
Florida, Inc.,  Hughes Bros., Inc.,      12cv6285 (JGK)
and Tutor Perini Corp.,                  13cv3123 (JGK)

                                         OPINION AND ORDER
Petitioners.

————————————————————————

JOHN G. KOELTL, District Judge:

        These actions in admiralty arose out of injuries that

claimant Jose Ayala sustained after falling off a barge named

"Hughes 660" on the Hudson River.  Ayala contends that he fell

off the barge because the barge was jolted by a tugboat.  The

petitioners, Bridge Construction Services of Florida, Inc.

("Bridge"), Hughes Brothers, Inc. ("Hughes"), and Tutor Perini

Corp. ("Tutor Perini"), are purported owners or bareboat

charterers of the vessels involved in the incident.

        Claimant Jose Ayala and his wife, claimant Teresa Ayala,

(collectively, "the Ayalas") have previously commenced actions

in the New York State Supreme Court against the petitioners and

against Tri-State Electric Contracting, Inc. ("Tri-State"), a

contractor also working on Hughes 660 at the time the incident

occurred.  Each of the petitioners subsequently filed a separate

petition in this Court seeking exoneration or limitation of

liability in connection with the incident under the Limitation

of Liability Act, 46 U.S.C. § 30501 et seq.  Claimants Jose
Ayala and Teresa Ayala filed claims against Bridge, Hughes, and
Tri-State for negligence and violation of the New York Labor Law
(NYLL).[1]  The Ayalas have also asserted claims against Tutor
Perini for negligence under general maritime law and the
Merchant Marine Act of 1920, also known as the Jones Act, 46
U.S.C. § 30104 et seq.  Tutor Perini has also asserted an
indemnification claim against Bridge based on a Subcontract
Agreement between the two parties.

This Court has subject matter jurisdiction under 28 U.S.C.
§ 1333(1) and 46 U.S.C. § 30511(a) over the exoneration and
limitation of liability claims.  The Court has supplemental
jurisdiction under 28 U.S.C. § 1367(a) over any state law claims
asserted in this action.  The petitioners and Tri-State now move
for summary judgment seeking exoneration, limitation of
liability, or dismissal of the Ayalas' claims against the
movants pursuant to Federal Rule of Civil Procedure 56.  Tutor
Perini also moves under Rule 56 for summary judgment on its
indemnification claim against Bridge.

---

[1] The Ayalas subsequently made clear that the only state law
claims they have ever asserted are the NYLL claims against Tri-
State, but have since withdrawn those claims.  See infra Part
VII.

**I.**

The standard for granting summary judgment is well established.  "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable

inferences against the moving party.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)
(citing United States v. Diebold, Inc., 369 U.S. 654, 655
(1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is
improper if there is any evidence in the record from any source
from which a reasonable inference could be drawn in favor of the
nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d
29, 37 (2d Cir. 1994).  If the moving party meets its burden,
the nonmoving party must produce evidence in the record and "may
not rely simply on conclusory statements or on contentions that
the affidavits supporting the motion are not credible . . . ."
Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.
1993).


## II.

     The following facts are undisputed for purposes of this
motion, unless otherwise indicated.

     In December 2010, the Tappan Zee Bridge on the Hudson River
in New York was undergoing renovations; petitioner Tutor Perini
was the general contractor of the renovation project.  In
connection with the project, Tutor Perini entered into a
bareboat charter with petitioner Hughes and leased from Hughes
several barges including Hughes 660, the barge that was later
involved in the incident in this case; Hughes was the owner of

4

these barges.  (See generally McDermott Decl. Ex. 5.)  The
barges were used as working platforms from which various
contractors, including Tri-State, performed work on the Tappan
Zee Bridge.  Tutor Perini also hired petitioner Bridge, which
supplied and operated two tugboats that would move the barges
when needed.  One of these tugboats, the "Bruce Russell," was
involved in the incident in this case.  The Bruce Russell was
owned by non-party Workboat Services, Inc., (Sweet Dep. at 78),
and was operated by Kenny Kling, an employee of Bridge.  (Kling
Dep. at 22, 24-27.)

Claimant Jose Ayala was hired as a laborer by Tutor Perini
to work on the project.  (Ayala Dep. 18, 22-23.)  Mr. Ayala was
hired to replace another laborer named Carlos, who taught Ayala
his duties.  (Chakides Dep. at 25, 28-29.)  Mr. Ayala's duties
involved tying and untying the tugboat and the barges.  Ayala
would assist the tugboat captain Kling in moving the barges with
the tugboat and tying the barges to dolphins, which are clusters
of piles situated in front of bridge supports, so that Tri-State
could install electrical conduits on the side of the Tappan Zee
Bridge.

Kling directed Ayala's work and made decisions on site
regarding the operation of the tugboat.  (Kling Dep. at 123,
210.)  Kling was not licensed to operate a tugboat, even though
he was required to have such a license.  (Kling Dep. at 27,

120.)  In December, 2010, Bruce Sweet, the owner and president

of Bridge, found out that Kling was not licensed but continued

to allow him to operate the tugboat because he had no one else

to fill that job.  (Kling Dep. at 120; Sweet Dep. at 6, 23-26.)

Ayala had fallen into the river the day before the incident

at issue in this case.  Consequentially, Kling expressed

concerns to Sweet and to Chakides, the foreman of Tutor Perini,

that Ayala was not made for the job, but both Chakides and Sweet

urged Kling to continue to work with Ayala.  (Ayala Dep. at 47,

50; Kling Dep. at 154, 158-59, 207, 219-21.)

On the morning of December 15, 2010, Ayala and Tri-State

electricians boarded the tugboat to be ferried to work barges.

After the tugboat moved Hughes 660 to a new location, Ayala

began the process of tying up the barge.  He fell into the water

during the process and was injured as a result.  (Ayala Dep. at

64-69, 75, 81, 130.)

The parties dispute the events and conditions surrounding

the accident.  Ayala testified that he fell from the barge after

the barge experienced an impact that caused him to lose his

footing.  (Ayala Dep. at 123, 130.)  Andrew Reeves, a Tri-State

electrician onboard the barge at the time, testified that he

felt a "bump" hard enough that it could possibly make someone

standing on the edge of the barge lose footing.  (Reeves Dep. at

30-31.)

6

Ayala testified that he had no direct line of sight with the tugboat and could not see the tugboat at the time. (Ayala Dep. at 78). However, he described that the accident occurred while the tugboat was pushing the barge. He explained that his testimony about the collision between the two vessels was based on his observation that the water waves were pushing in the direction opposite from the direction in which the tugboat was pushing the barge. (Ayala Dep. at 123.) He also testified that, prior to the impact, Kling, who was operating the tugboat, was trying to push the barge to the bridge but could not succeed at first because the waves were tall, and that the tugboat had to come back with more speed to push the barge. Ayala testified that he was not expecting that impact and that was when he fell. (Ayala Dep. at 81.) Kling wrote a written statement two days after the incident, confirming that "[a]s I was pushing barge back to the bridge, [Ayala] fell off the north side of the barge into the water." (Chinigo Decl. Ex. 2.)

There is testimony suggesting that Ayala was standing on a slippery surface of ice and wet steel, immediately before falling off the barge. (Ayala Dep. at 82.) Tutor Perini's post-accident report also indicated that slippery conditions were a cause of the incident. (Chinigo Decl. Ex. 15 at 2.) Brian Hughes, a representative of Hughes, testified that it was common practice to paint barges using non-skid paint. (Hughes

7

Dep. at 43.)   However, according to the on-hire survey of the
barge dated November 24, 2010, the paint coatings on the barge
were "well worn with rust grit."   (McDermott Decl. Ex. 6, at 2.)
A superintendent of Tutor Perini, David Daoust, testified that
the deck of the barge had dents in which water tended to pool
and freeze in puddles during winter time.   (Daoust Dep. at 38-
39.)   The parties also dispute whose responsibility it was to
remove the ice: some evidence suggests that Tri-State
electricians performed the duty on the day of the incident as
well as on other days and that Ayala never performed such
duties, (Reeves Dep. at 24-25), while other evidence suggests
that it was Tutor Perini's responsibility to maintain the safety
of the work environment, (Milner Dep. at 23; Chakides Dep. at
17).

     The Ayalas commenced an action against Bridge, Hughes, and
Tri-State in the New York State Supreme Court, New York County
on April 9, 2012.   The Ayalas commenced another action against
Tutor Perini in the New York State Supreme Court, Bronx Country
on April 8, 2013.   Bridge, Hughes, and Tutor Perini each filed a
petition for exoneration or limitation of liability on May 3,
2012, August 16, 2012, and May 9, 2013, respectively.

III.

Under the Limitation of Liability Act, which was originally enacted in 1851 and was last amended in 2006, see Pub. L. 109-304, § 6, Oct. 6, 2006, 120 Stat. 1485, 1514, "the liability of the owner of a vessel for any claim, debt, or liability . . . shall not exceed the value of the vessel and pending freight," 46 U.S.C. § 30505(a), provided that such claims, debts, or liabilities "aris[e] from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner," except otherwise excluded by law, id. § 30505(b).  "The Act thus protects the owner of a vessel from unlimited vicarious liability for damages caused by the negligence of his captain or crew."  Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 244 (2d Cir. 2014).  For purposes of the limitation of liabilities, "the term 'owner' includes a charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement."  46 U.S.C. § 30501.

To take advantage of the protection of the statute, "[t]he owner of a vessel may bring a civil action in a district court of the United States for limitation of liability . . . within 6 months after a claimant gives the owner written notice of a

9

claim." 46 U.S.C. § 30511(a). After the owner posts the security required under 46 U.S.C. § 30511(b), the district court then "issue[s] a notice to all persons asserting claims with respect to which the [petition] seeks limitation," instructing the claimants to file their claims in the limitation proceeding before a specified deadline. Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), Fed. R. Civ. P., Supp. R. F(4). Thus, "[t]he proceeding partakes in a way of the features of a bill to enjoin the multipicity of suits, a bill in the nature of an interpleader, and a creditor's bill," which "looks to a complete and just disposition of a many-cornered controversy, and is applicable to proceedings in rem against the ship, as well as to proceedings in personam against the owner; the limitation extending to the owner's property as well as to his person." Hartford Acc. & Indem. Co. of Hartford v. S. Pac. Co., 273 U.S. 207, 216 (1927).

It is well established that a vessel owner may seek both limitation of liability and a total exoneration from liability in the same limitation action. See, e.g. Tandon, 752 F.3d at 244; In re Rationis Enterprises, Inc. of Pananma, 210 F. Supp. 2d 421, 424 n.4 (S.D.N.Y. 2002); Supplemental Rules, Fed. R. Civ. P., Supp. R. F(2). Nevertheless, the Act and the Supplemental Rules "do not create a freestanding right to

10

exoneration from liability in circumstances where limitation of liability is not at issue." Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 453 (2001). In other words, a vessel owner has no right to seek exoneration if the owner's right to limitation of liability in the federal court is adequately protected--for example, by stipulations that the total claim for damages would not exceed the value of the vessel and that any claim of res judicata bearing on the limitation of liability before the federal court is waived. Id.

In a limitation proceeding, also known as a concursus, the federal district court, sitting in admiralty without a jury, engages in a two-step inquiry. In re Dammers, 836 F.2d 750, 755 (2d Cir. 1988). First, the Court must determine "what acts of negligence or unseaworthiness caused the casualty." In re Moran Towing Corp., 984 F. Supp. 2d 150, 180 (S.D.N.Y. 2013). "[T]he court must determine whether the accident was caused by conduct that is actionable, for if there was no fault or negligence for the shipowner to be privy to or have knowledge of within the meaning of the statute, there is no liability to be limited, and the owner would then be entitled to exoneration." In re Messina, 574 F.3d 119, 126 (2d Cir. 2009) (quoting The 84-H, 296 F. 427, 432 (2d Cir. 1923)) (internal quotation marks omitted).[2]

---

[2] In a limitation of liability proceeding, the Court can consider state law claims against the owner or charterer along with the

Second, if the court finds that acts of negligence or unseaworthiness caused the casualty, the court must determine "whether the shipowner had knowledge or privity of these acts." In re Moran Towing Corp., 984 F. Supp. 2d at 180 (internal citations omitted).  The owner is entitled to limitation of liability if the acts occurred "without the privity or knowledge of the owner."  46 U.S.C. § 30505(b).  The claimants bear the initial burden of establishing liability, after which the vessel owner bears the burden of establishing the lack of privity or knowledge.  Otal Investments Ltd. v. M/V CLARY, 673 F.3d 108, 115 (2d Cir. 2012) (citations omitted); accord Beiswenger Enterprises Corp. v. Carletta, 86 F.3d 1032, 1036 (11th Cir. 1996).

---

maritime and other federal law claims against the owner or charterer, because the issue in such a proceeding is whether the total liability against the owner or charterer is limited to the value of the vessel and her cargo.  46 U.S.C. § 30505(a); Van Schaeffer v. Tsakos Shipping & Trading, S.A., No. 05cv4486, 2006 WL 1192939, at *1 (E.D. Pa. May 2, 2006) ("The . . . state common-law claims must be litigated as part of the Limitation Action.  The Limitation Act permits a vessel owner to compel all suits to be filed in a single action limited to the value of the vessel and its freight."  (Internal citation omitted)).  Of course, if the owner is found not entitled to either exoneration or limitation of liability, a separate proceeding may be initiated to pursue the claims against the owner.  See In re Arntz, 380 F. Supp. 2d 1156, 1158 (C.D. Cal. 2005); see also Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 595 (2d Cir. 1961).

IV.

Petitioner Bridge, the alleged charterer of the tugboat, moves for summary judgment granting its petition, arguing that it was not negligent and is therefore entitled to exoneration.[3]

In a limitation of liability proceeding, "[t]he elements to establish a claim of negligence under maritime law are the same as the elements of negligence under common law." In re Re, No. 07cv0223, 2008 WL 4069747, at *3 (E.D.N.Y. Aug. 27, 2008) (citing, inter alia, In re Kinsman Transit Co., 338 F.2d 708, 721 (2d Cir. 1964)); accord Cornfield v. Cornfield, 156 F. App'x 343, 344 (2d Cir. 2005) (unpublished opinion). These elements include duty, breach of duty, causation, and damages. Cornfield, 156 F. App'x at 344. Essentially, to determine

---

[3] Because the Limitation of Liability Act allows for limitation of liability or exoneration of only owners or bareboat charterers, 46 U.S.C. § 30501, 30505(a), a preliminary issue is whether Bridge is an owner or bareboat charterer of the tugboat, the Bruce Russell. It appears that the Bruce Russell was owned by non-party Workboat Services, Inc., (Sweet Dep. at 78; Chinigo Decl. Ex. 1), and Bridge failed to produce any evidence in its opening papers to establish that Bridge was the owner or bareboat charterer of the tugboat. Along with its reply papers, Bridge submitted an affidavit of Bruce Sweet swearing that Bridge was the bareboat charterer of the Tugboat. Arguments and evidence submitted for the first time on reply need not be considered, see, e.g., Wolters Kluwer Fin. Servs. Inc. v. Scivantage, No. 07cv2352, 2007 WL 1098714, at *1 (S.D.N.Y. Apr. 12, 2007), but they can be considered if responsive to arguments raised in the responsive papers, see Mattera v. Clear Channel Commc'ns, Inc., 239 F.R.D. 70, 74 n.4 (S.D.N.Y. 2006). For the sake of completeness, this Court assumes, for purposes of these motions, that Bridge was indeed a bareboat charterer of the tugboat.

whether there was actionable conduct that constitutes negligence, "[t]he test is, could the collision have been prevented by the exercise of ordinary care, caution and maritime skill?" The Jumna, 149 F. 171, 173 (2d Cir. 1906).

In this case, Ayala argues that Bridge was negligent because the tugboat captain, Kling, operated the tugboat in a way that rammed the barge and created an impact that caused the plaintiff to fall off the barge. In response, Bridge argues that there is no evidence that the tugboat actually rammed the barge. Ayala testified that the impact from the barge's hitting the tugboat caused him to fall off the barge, but also admitted that he had no direct line of sight with the tugboat and could not see the tugboat at the time. Bridge argues that, because neither Ayala nor any other witnesses actually saw the tugboat ramming into the barge, Ayala's assertion is just speculation.

It is true that "mere speculation and conjecture is insufficient to preclude the granting of the motion [for summary judgment]." Harlen Associates v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). In addition, "where a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012)

14

(quoting Fed. R. Civ. P. 56(c)(4)).  Nevertheless, "personal
knowledge" includes basic, commonsensical inferences, so long as
they are "grounded in observation or other first-hand personal
experience" and are not "flights of fancy, speculations,
hunches, intuitions, or rumors about matters remote from that
experience."  Visser v. Packer Eng'g Associates, Inc., 924 F.2d
655, 659 (7th Cir. 1991) (citations omitted); accord Davis v.
Peake, No. 08cv3570, 2011 WL 4407551, at *4 n.2 (S.D.N.Y. Sept.
22, 2011), aff'd, 505 F. App'x 67 (2d Cir. 2012).

   In this case, Ayala's testimony about the impact caused by
a collision was not mere speculation remote from his personal
experience of the incident.  He described the circumstances
surrounding the impact that he felt.  Ayala's testimony about
the impact is corroborated by the testimony of Andrew Reeves, a
Tri-State electrician also onboard the barge at the time, who
testified that he also felt a "bump" hard enough that it could
possibly make someone standing on the edge of the barge lose
footing.  Ayala testified that his testimony about the collision
between the two vessels was based on his observation that the
water waves were pushing in the direction opposite from the
direction in which the tugboat was pushing the barge.  He
further testified that, prior to the impact, the tugboat was
trying to push the barge to the bridge but could not succeed at
first because the waves were tall, and that the tugboat had to

come back with more speed to push the barge.  His testimony is corroborated by Kling's written statement two days after the incident that "[a]s I was pushing barge back to the bridge, [Ayala] fell off the north side of the barge into the water." (Chinigo Decl. Ex. 2.)  Moreover, there is also an issue of fact about whether Kling, an unlicensed captain, exercised "ordinary care, caution and maritime skill," The Jumna, 149 F. at 173, when he pushed the barge with the tugboat in the absence of any means of communication and coordination with Ayala, who was attempting to tie the barge to the dolphins at the bridge. (Ayala Decl. at 53; Kling Dep. at 53.)

Taken together, there is sufficient evidence in the record to raise genuine issues of material fact as to whether the tugboat, operated by Kling, rammed the barge with an unusually strong force, causing the plaintiff to fall off the barge while he was standing on a slippery surface, and whether Kling otherwise acted negligently.  See Crowley v. Costa, No. 09cv1991, 2011 WL 5593112, at *4-5 (D. Conn. Nov. 17, 2011) (denying summary judgment because triable issues of fact existed as to "whether the allision could have been prevented by

ordinary skill and caution").[4]  Therefore, the Court cannot find, on this motion, that Bridge is entitled to exoneration.[5]

In response to Bridge's petition, claimant Teresa Ayala additionally asserted a claim for loss of consortium due to Mr. Ayala's injuries.  (Claim of Jose and Teresa Ayala ¶¶ 61-63, Bridge Construction Services of Florida, Inc. v. Ayala et al. ("Bridge Petition"), No. 12cv3536 (S.D.N.Y. July 16, 2012), ECF No. 16.)  Bridge argues that Mrs. Ayala's loss of consortium claim must be dismissed because such a claim is not recognized under maritime tort law.  At oral argument, counsel for Mrs. Ayala conceded that Mrs. Ayala has no such claim against Bridge. (Tr. of Oral Argument on July 7, 2014 ("Tr.") at 10.)  In any event, the Ayalas' papers have failed to address this argument in any way; therefore, the loss of consortium claim against Bridge is deemed abandoned and must be dismissed.  See Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J., 894 F. Supp. 2d 288, 331-32 (S.D.N.Y. 2012) (collecting cases).

---

[4] In maritime law, an allision is the ramming of one vessel into another vessel that is stationary.  See Superior Const. Co., Inc. v. Brock, 445 F.3d 1334, 1336 (11th Cir. 2006).

[5] Normally, in a limitation of liability proceeding, if the Court finds acts of fault or negligence and concludes that a vessel owner is not entitled to exoneration, the Court analyzes next "whether the shipowner had knowledge or privity of these acts" to determine whether the owner is entitled to limitation of liability.  In re Moran Towing Corp., 984 F. Supp. 2d at 180. However, Bridge explicitly argues only that it is entitled to exoneration and made clear at oral argument that it does not seek limitation of liability.  (Tr. at 2-3.)

Accordingly, Bridge's motion for summary judgment is **denied** to the extent that it seeks exoneration from all liability, but **granted** to the extent that Mrs. Ayala's loss of consortium claim against Bridge is **dismissed.**

## V.

Petitioner Hughes, the owner of the barge involved in the incident, moves for summary judgment granting its petition for exoneration or limitation of liability.  Ayala and Bridge oppose the motion on the grounds that the barge was unseaworthy because of the existence of potentially dangerous conditions and the lack of adequate safety features and that Hughes had knowledge or privity with respect to the unseaworthiness of the vessel.

## A.

At the first step in a limitation of liability proceeding, the Court determines whether the vessel owner is entitled to exoneration by inquiring into whether there are any "acts of negligence or unseaworthiness [that] caused the casualty."  In re Moran Towing Corp., 984 F. Supp. 2d at 180.  A vessel is "seaworthy" if it is "reasonably fit for the voyage."  The Joseph F. Clinton, 250 F. 977, 980 (2d Cir. 1918).  In cases in which a vessel is used as a working platform, the vessel must be "reasonably fit to permit a seaman to do his work with safety."

18

See Morton v. Berman Enterprises, Inc., 669 F.2d 89, 90, 92 (2d Cir. 1982) (citations omitted).  However, "although unseaworthiness is a broader form of liability than negligence and has been characterized as 'a form of absolute liability,' it does not impose a duty of perfection on shipowners."  Id. at 92 (internal citation omitted).  The standard of seaworthiness

> is not to suggest that the owner is
> obligated to furnish an accident-free ship.
> The duty is absolute, but it is a duty only
> to furnish a vessel and appurtenances
> reasonably fit for their intended use. The
> standard is not perfection, but reasonable
> fitness; not a ship that will weather every
> conceivable storm or withstand every
> imaginable peril of the sea, but a vessel
> reasonably suitable for her intended
> service.

Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960) (citation omitted).

A vessel may be rendered unseaworthy because of improperly maintained surfaces that are slippery and are prone to cause injuries.  Compare Nicroli v. Den Norske Afrika-Og Australielinie Wilhelmsens Dampskibs-Aktieselskab, 332 F.2d 651, 654 (2d Cir. 1964) (affirming finding of unseaworthiness where wet and melted sugar had made the deck slippery), Troupe v. Chicago, D. & G. Bay Transit Co., 234 F.2d 253, 258 (2d Cir. 1956) (holding that triable issues of fact existed as to whether the vessel was unseaworthy because certain steps "were so painted and maintained as to be excessively slippery, especially

19

when covered with water from a rain"), Courville v. Cardinal
Wireline Specialists, Inc., 775 F. Supp. 929, 936 (W.D. La.
1991) (finding unseaworthiness "because of the absence of non-
skid tape or some other appropriate skid resistent surface on
the steep steps"), Jiminez v. United States, 321 F. Supp. 232,
233 (S.D.N.Y. 1970) (finding unseaworthiness where de-greaser
solvent created a slippery condition and was allowed to remain
unwiped while the workers lunched elsewhere without roping off
the ladder or putting up any warning), and In re Sirret Offshore
Towing Co., No. 96cv1228, 1997 WL 539923, at *4 (E.D. La. Sept.
2, 1997) (finding that the vessel was unseaworthy in part
because of the lack of anti-skid paint or mats), with Santamaria
v. The SS Othem, 272 F.2d 280, 281 (2d Cir. 1959) (holding that
"a deck made slippery [only] by rainwater does not constitute an
unseaworthy condition").

In this case, the Ayalas, as claimants, argue that the
barge from which Mr. Ayala fell was unseaworthy because its
anti-skid paint was worn off and because the deck had
indentations in which ice could easily accumulate.  Brian Hughes
testified that it was common practice to paint barges using non-
skid paint.  However, according to a survey dated November 24,
2010 commissioned by Hughes, even though the deck was equipped
with diamond pattern plating, the paint coatings were "well worn
with rust grit."  A superintendent for Tutor Perini, David

20

Daoust, testified that the deck had dents in which water tended to pool and freeze in puddles during winter time.

In response, Hughes introduced in its reply a services statement and an expert report to support its claim for seaworthiness.  (See Hughes Reply Exs. 1 and 2.)  Arguments and evidence submitted for the first time in reply need not be considered, see, e.g., Wolters Kluwer Fin. Servs. Inc. v. Scivantage, No. 07cv2352, 2007 WL 1098714, at *1 (S.D.N.Y. Apr. 12, 2007), although they may be considered if they are truly responsive materials.  See Mattera v. Clear Channel Commc'ns, Inc., 239 F.R.D. 70, 74 n.4 (S.D.N.Y. 2006).

Even if the Court considers the reply evidence submitted by Hughes, the Court cannot conclude that summary judgment is warranted.  Hughes first points to the services statement for work done on the barge, which indicated that "1 touch-up coat of epoxy and 1 full coat of paint" was applied to the barge. (Hughes Reply Ex. 1.)  It is not clear whether the paint applied was non-skid paint; even if it was, the dates on the services statement indicate that the work was done in July 2008, while the survey report indicating the paint coatings being "well worn" was dated November 24, 2010, which was much closer temporally to the incident on December 15, 2010.  In any event, there is at the very least a dispute of fact in light of the

conflicting evidence, which cannot be resolved on summary judgment.

Hughes also relies on the report of a liability expert, Mr. Claudio Crivici, who opined that the diamond plating offered sufficient anti-skid protection and that "the quality of the barge deck anti-skid [features] was not contributory to the alleged incident."  (Hughes Reply Ex. 2 at 4.)  However, the expert opinion merely stated a conclusion and offered no reliable basis for that conclusion.  (See Hughes Reply Ex. 2 at 4.)  Therefore, the Court cannot rely on Mr. Crivici's report on this motion.  See Colon v. Abbott Labs., 397 F. Supp. 2d 405, 414-15 (E.D.N.Y. 2005) (declining to consider on a motion for summary judgment an expert's testimony which supplied no support for the expert's opinion except an incomplete study).

Moreover, with respect to the ice on the deck, Mr. Crivici acknowledged that "water puddles could form in ice on the deck." (Hughes Reply Ex. 2 at 4.)  Nevertheless, he concluded, based on his review of the depositions, that the ice on the deck did not cause the incident because de-icing chemicals "were available" and that either Mr. Ayala or the Tri-State electricians either had the duty to--or "would have"--cleaned up any ice that had accumulated due to previous precipitation, (Hughes Reply Ex. 2 at 4-5).  Not only are these conclusions speculative, but they are also not based on any "scientific, technical, or other

specialized knowledge."  Fed. R. Evid. 702(a); see also Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc., No. 07cv07483, 2010 WL 4892646, at *7 (S.D.N.Y. Dec. 2, 2010) ("The opinion was based entirely on examinations of plaintiffs['] sales and marketing plans and of deposition testimony.  Reaching it required no specialized knowledge and usurped the jury[']s role as fact-finder."), aff'd, 501 F. App'x 85 (2d Cir. 2012). Accordingly, the expert report cannot support granting summary judgment in favor of Hughes.

Hughes also argues that the incident was caused by the impact from the tugboat hitting the barge, not by the unseaworthiness of the barge.  However, a claimant need not show that the unseaworthiness was the sole cause of incident; the vessel owner is not entitled to exoneration if the unseaworthy condition contributorily caused the incident.  See Am. Dredging Co. v. Lambert, 81 F.3d 127, 129 (11th Cir. 1996) ("A shipowner is entitled to exoneration from all liability for a maritime collision only when it demonstrates that it is free from any contributory fault."); The Commerce, 46 F. Supp. 360, 363 (S.D.N.Y. 1941), aff'd sub nom. New England S S Co. v. Howard, 130 F.2d 354 (2d Cir. 1942).

In this case, Ayala testified that the surface was slippery and that he slipped and fell after the impact.  A factual issue exists as to whether the allegedly slippery condition of the

deck caused by an accumulation of ice in a dented deck without a sufficient non-skid surface contributed to his fall, thus precluding exoneration for the barge owner.  See Juliussen v. Buchanan Marine, L.P., No. 08cv1463, 2010 WL 86936, at *12 (S.D.N.Y. Jan. 7, 2010).[6]


B.

At the second step of the limitation of liability proceeding, the Court determines whether the vessel owner who is not entitled to exoneration because of acts of fault is nevertheless entitled to limitation of liability.  In re Moran Towing Corp., 984 F. Supp. 2d at 180.  The owner is entitled to limit its liability to the value of the vessel and her cargo if the negligence or unseaworthiness causing the injuries was outside the "privity or knowledge" of the owner.  46 U.S.C. § 30505(b).

The owner bears the burden of showing lack of privity or knowledge.  Otal Investments Ltd, 673 F.3d at 115.  To meet its

---

[6] Hughes also argues that it is entitled to exoneration because it chartered the boat to Tutor Perini and that the charter agreement implied seaworthiness.  This argument is unpersuasive. The implied warranty of seaworthiness in a charter agreement is simply a contractual obligation owed by the owner to the charterer, which allows the charterer to recover from the owner damages caused by unseaworthiness that has existed before the vessel is delivered to the charterer.  It does not preclude issues of fact raised by a non-party, such as Ayala, that the vessel was not in fact seaworthy.

burden, the owner "must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause. If it cannot show how the loss occurred, a defendant must exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge." Terracciano v. McAlinden Const. Co., 485 F.2d 304, 308 (2d Cir. 1973). Moreover, the owner "need not have had actual knowledge of the unseaworthiness or negligence; it is sufficient that [the owner] 'should have known' of the breach." In re Moran Towing Corp., 984 F. Supp. 2d at 180 (citation omitted).

In this case, Hughes argues that it had no privity or knowledge with respect to the unseaworthy condition because the barge was chartered to Tutor Perini under a bareboat charter agreement. Hughes claims to have no involvement with the Tappan Zee Bridge project and had no employees on site. However, "[d]espite the existence of a bareboat charter, the owner of the vessel can be liable to third persons if the vessel was not seaworthy at the inception of the charter." Torch, Inc. v. Alesich, 148 F.3d 424, 427 (5th Cir. 1998). Thus, Hughes's argument is without merit.

Hughes has made no additional argument regarding its lack of privity or knowledge. Indeed, evidence in the record raises a factual issue as to the seaworthiness of the vessel when it was delivered to Tutor Perini. The bareboat charter agreement

25

between Hughes and Tutor Perini, which was entered into on November 22, 2010, specified that the charter would commence "upon completion of the On-Hire Survey . . . or when the vessel leaves the delivery location, . . . which ever shall first occur." (McDermott Decl. Ex. 5 at 1-2.) The "delivery location" was specified to be in the Erie Basin in Brooklyn, New York. (McDermott Decl. Ex. 5 at 1.) The on-hire survey was conducted by a surveyor hired by Hughes on November 23, 2010, when the barge was still in the Erie Basin and thus had not left the delivery location; the on-hire survey report, dated November 24, 2010, indicated that the paint coatings were "well worn with rust grit." (McDermott Decl. Ex. 6, at 1-2.) Thus, there is a factual issue as to whether, upon commencement of the charter, Hughes either knew or "should have known" of the condition alleged to constitute unseaworthiness. See Drejerwski v. C.G. Willis, Inc., 587 F. Supp. 1515, 1517 (E.D. Pa. 1984) (holding that the jury could properly have found the barge owner negligent because the barge owner should have known that the epoxy paint used on the barge would be "dangerously slippery in inclement weather" and "should have chosen a non-skid paint instead").

Therefore, Hughes has failed to carry its burden of demonstrating the lack of privity or knowledge with respect to the unseaworthiness of the vessel, and is therefore not entitled

to limitation of liability on this motion.  Accordingly,
Hughes's motion for summary judgment seeking exoneration or
limitation of liability is **denied.**

**VI.**

Tutor Perini, the general contractor of the Tappan Zee
Bridge renovation project and Ayala's employer, moves for
summary judgment seeking exoneration or limitation of liability.
Tutor Perini chartered the barge from Hughes under a bareboat
charter agreement.  (McDermott Decl. Ex. 5.)  Therefore, Tutor
Perini is an "owner" of the barge for purposes of the Limitation
of Liability Act, which defines "owner" as including a bareboat
charterer.  46 U.S.C. § 30501; Mediterranean Shipping Co. S.A.
Geneva v. POL-Atl., 229 F.3d 397, 400 (2d Cir. 2000).  Ayala
brings claims under general maritime law as well as the Jones
Act[7] against Tutor Perini.  The Court applies the same limitation
analysis as explained above, determining first the question of
exoneration based on the owner's fault or negligence and second
the limitation of liability based on the privity or knowledge of
the owner.

---

[7] The Jones Act does not abrogate the proceedings under the
Limitation of Liability Act--that is, a Jones Act claim asserted
against the owner of a vessel is also subject to the limitation
of liability.  In re E. River Towing Co., 266 U.S. 355, 367
(1924).

**A.**

**1.**

**a.**

Tutor Perini seeks exoneration from the Jones Act claim. The Jones Act provides that "[a] seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104(a).  Tutor Perini argues, as a threshold matter, that Ayala was not a "seaman" within the meaning of the Jones Act.

Under the Supreme Court's decision in Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995), determining the "seaman" status of an employee entails a two-fold inquiry:

> First, . . . "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'" Second, . . . a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.

515 U.S. 347, 368 (internal citations omitted).  Therefore, the inquiry is necessarily fact-intensive and is usually reserved for the fact-finder.  See O'Hara v. Weeks Marine, Inc., 928 F. Supp. 257, 259 (E.D.N.Y. 1996).

28

In this case, Ayala's duties were tying and untying the tugboat and the barges, so that the barges could be moved to and fixed at appropriate locations, allowing work to be done from the barges.  The tugboat, operated by Kling, was used to move these barges.  Ayala would be aboard the tugboat; he would disembark onto the barge to tie up a barge, climb back to the tugboat, and be ready to move on to tie up the next barge. Therefore, a reasonable fact-finder could find that Ayala contributed to the functions of the vessels and the accomplishment of their mission and that he had a sufficient connection with the vessels.

Tutor Perini cites Frazier v. Core Indus., Inc., 39 So. 3d 140 (Ala. 2009), in which the court found that a land-based worker who only spent time on the barge "when the barge was being moved short distances along the shoreline by a crane" was not a "seaman" for purposes of the Jones Act.  Id. at 154. However, the worker in that case was "not a sea-based maritime employee whose duties regularly took him to sea."  Id.  As the court noted, "[he] was not a member of the crews that regularly offloaded the barges and was not paid like them.  He regularly did welding work on items that were on the land while he was on land.  His base of operation was a mechanic shop on land."  Id. By contrast, Ayala's work was almost entirely on the waters, and

he regularly moved between the tugboat and the barge to perform his job functions.[8]

Chandris also requires that "a seaman must have a [sufficient] connection to a vessel in navigation." 515 U.S. 347, 368 (emphasis added).  "[T]he underlying inquiry whether a vessel is or is not 'in navigation' for Jones Act purposes is a fact-intensive question that is normally for the jury and not the court to decide."  Id. at 373.  Here, Tutor Perini argues that Ayala was not a seaman because the barge on which he worked was not a vessel "in navigation" at the time he fell off.  Tutor Perini cites DiGiovanni v. Traylor Brothers, Inc., 959 F.2d 1119 (1st Cir. 1992) (en banc), where the court held that "[a] worker becomes a seaman not by reason of the physical characteristics of the structure to which he is attached, but because its being operational 'in navigation' exposes him to 'a seaman's hazards,'" id. at 1123, and that a barge positioned at a bridge was not a vessel "in navigation," id. at 1121, 1123-24.

However, that holding in DiGiovanni was overruled by the Supreme Court in Stewart v. Dutra Const. Co., 543 U.S. 481 (2005).  In Stewart, the Supreme Court held that,

---

[8] Tutor Perini also cites Harbor Tug & Barge Co. v. Papai, 520 U.S. 548 (1997).  However, Papai is even further removed from the facts of this case.  In Papai, the worker "was hired for one day to paint the vessel at dockside and he was not going to sail with the vessel after he finished painting it."  Id. at 559.

> [a] ship and its crew do not move in and out
> of Jones Act coverage depending on whether
> the ship is at anchor, docked for loading or
> unloading, or berthed for minor repairs, in
> the same way that ships taken permanently
> out of the water as a practical matter do
> not remain vessels merely because of the
> remote possibility that they may one day
> sail again.

Id. at 494.[9]  The Supreme Court observed that:

> Just as a worker does not "oscillate back
> and forth between Jones Act coverage and
> other remedies depending on the activity in
> which the worker was engaged while injured,"
> Chandris, 515 U.S. at 363, neither does a
> watercraft pass in and out of Jones Act
> coverage depending on whether it was moving
> at the time of the accident.

---

[9] Even though Stewart was a case about the test for determining
whether a watercraft is a "vessel" for purposes of the Longshore
and Harbor Workers' Compensation Act (LHWCA), 543 U.S. at 484,
its holding on the scope the Jones Act governs analyses under
the Jones Act because of the complimentary relationship between
the Jones Act and the LHWCA.  Stewart, 543 U.S. at 488.  The
Jones Act covers "seam[e]n," 46 U.S.C. § 30104, which, as
discussed above, are those who "contribute to the function of
the vessel or to the accomplishment of its mission" and had
substantial connection with a vessel in navigation or an
identifiable group of such vessels.  Chandris, 515 U.S. at 368
(internal quotation marks and citations omitted).  The LHWCA was
passed after the Jones Act and exempts from its coverage "a
master or member of a crew of any vessel."  33 U.S.C. §
902(3)(G).  The Supreme Court has held that "the Jones Act and
the LHWCA are complementary regimes that work in tandem."
Stewart, 543 U.S. at 488.  Thus, by making it clear that a
"vessel" does not fall outside of the scope of the Jones Act and
into the scope of the LHWCA simply because the vessel is not
actually "in navigation" at a given time, the Supreme Court
draws a fixed boundary between two complimentary statutory
regimes; thus, its holding necessarily applies to both statutes.
See Stewart v. Dutra Const. Co., 418 F.3d 32, 34 (1st Cir.
2005).

Id. at 495-96.  Therefore, the "in navigation" requirement is not about the locomotion of a vessel at a given time; instead, the only relevant inquiry is

> whether the craft is "used, or capable of being used" for maritime transportation.  A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one.

Id. at 496 (citations omitted).

In this case, a reasonable fact-finder can certainly find that the barge, Hughes 660, was a "vessel in navigation" because the barge was used to carry personnel and machinery to perform work on the Tappan Zee Bridge.  This was clearly a "practical" and not "theoretical" use: Ayala's job involved tying and untying the barges so that they could be moved and fixed as needed to allow work on the bridge.  Tutor Perini does not dispute that the barge would be a "vessel in navigation" when it was being towed by the tugboat, (Tr. at 28), and, as Stewart has made clear, the locomotion of the vessel at a particular moment has no bearing on whether or not a vessel is a "vessel in navigation."  Accordingly, Tutor Perini's argument that the barge was not a "vessel in navigation" simply because it was

positioned against the bridge at any given time is without
merit.

Moreover, Tutor Perini does not and cannot dispute that the
tugboat was a "vessel in navigation" for Jones Act purposes.
(Tr. at 27-28.)  Thus, a fact-finder may find, in the
alternative that Ayala was a seaman based on his connection with
the tugboat.  The fact-finder could find, for example, that
Ayala was associated with the tugboat and went onto the barges
to perform his job functions of tying and untying the barges,
which contributed to the intended function of the tugboat,
namely, to manipulate the barges.  It would then be irrelevant
that Ayala was performing his job duties on the barge at the
time he fell off, because "maritime workers who obtain seaman
status do not lose that protection automatically when on shore
and may recover under the Jones Act whenever they are injured in
the service of a vessel, regardless of whether the injury occurs
on or off the ship."  Chandris, 515 U.S. at 360.

Finally, Tutor Perini also appears to argue that Ayala
cannot claim seaman status because he has received benefits
under the Longshore and Harbor Workers' Compensation Act
(LHWCA).  The LHWCA and the Jones Act are "complimentary"
regimes, Stewart, 543 U.S. at 488, and the remedy under each is
mutually exclusive of the remedy under the other, Chandris, 515
U.S. at 355-56, because the two Acts cover different groups of

employees: "the Jones Act provides tort remedies to sea-based maritime workers, while the LHWCA provides workers' compensation to land-based maritime employees." Stewart, 543 U.S. at 488. Hence, the receipt of a formal award under the LHWCA would be inconsistent with a claim under the Jones Act. However, as the Supreme Court has explained, "[i]t is by now 'universally accepted' that an employee who receives voluntary payments under the LHWCA without a formal award is not barred from subsequently seeking relief under the Jones Act." Sw. Marine, Inc. v. Gizoni, 502 U.S. 81, 91 (1991) (citation omitted); see also Mooney v. City of New York, 219 F.3d 123, 129 (2d Cir. 2000) (even "an interim award of workers compensation benefits that are analogous to maintenance and cure does not establish waiver, even if incorporated in a formal award"). In this case, Tutor Perini concedes that no formal award has been made. (Tutor Perini Mem. at 3 n.2.) Therefore, Ayala is not precluded from asserting seaman status in this litigation.

Accordingly, because sufficient evidence exists to allow a reasonable fact-finder to find that Ayala was a seaman for Jones Act purposes, summary judgment cannot be granted on the ground that Mr. Ayala was not a seaman.

34

**b.**

Tutor Perini next argues that Ayala has failed to establish that Tutor Perini was negligent and that summary judgment dismissing the Jones Act claim should be granted on the merits.

The Jones Act incorporates by reference the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., and extends to seamen the same legal remedies that injured railroad employees have under the FELA. See 46 U.S.C. § 30104; Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990); Wills v. Amerada Hess Corp., 379 F.3d 32, 47 n.8 (2d Cir. 2004); U.S. Lines, Inc. v. U.S. Lines Reorganization Trust, 262 B.R. 223, 240 n.12 (S.D.N.Y. 2001). A plaintiff's burden of showing causation and negligence is lighter under the FELA than it would be at common law because "the theory of the FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues." Tufariello v. Long Island R. Co., 458 F.3d 80, 87 (2d Cir. 2006) (citing and quoting Kernan v. Am. Dredging Co., 355 U.S. 426, 438-39 (1958)); see also Williams v. Long Island R.R. Co., 196 F.3d 402 (2d Cir. 1999). The same standard applies to a Jones Act claim because the Act incorporates the FELA. Hopson v. Texaco, Inc., 383 U.S. 262, 263-64 (1966); Wills, 379 F.3d at 47 n.8. Thus, on summary judgment, "[a] plaintiff is entitled to go to the jury [on a Jones Act or FELA claim] if the proofs

35

justify with reason the conclusion that employer negligence
played any part, <u>even the slightest</u>, in producing the injury for
which damages are sought." <u>Diebold v. Moore McCormack Bulk</u>
<u>Transp. Lines, Inc.</u>, 805 F.2d 55, 57 (2d Cir. 1986) (internal
quotation marks and citations omitted).

In this case, Ayala's testimony supported a conclusion that
ice on the deck contributed to his fall and injury.  Tutor
Perini's post-accident report also suggested that the icy
condition was the cause of the incident.  Nevertheless, Tutor
Perini now argues that it was not negligent in any way because
it had supplied adequate de-icing means and had trained Ayala
properly.  Tutor Perini contends that it supplied chemicals such
as calcium chloride for ice removal and that it communicated to
the workers various safety issues including the need to de-ice
the surface. (Milner Dep. at 38, 43.)  In response, Ayala argues
that he was not trained to de-ice the surface of the barge and
that Tutor Perini's failure to train him properly constituted
negligence.  The only training that Ayala received included an
orientation video and on-the-job training by his predecessor,
Carlos.  (Chakides Dep. at 25, 27.)  Tutor Perini conceded that
it has not put forth any evidence showing that either the
orientation video or Carlos taught Mr. Ayala about de-icing the
surface of the deck.  (<u>See</u> Milner Dep. at 26-27 (testifying
about the contents of the orientation video); Chakides Dep. at

36

25; Tr. at 22.)  Indeed, Ayala testified that he did not believe that removing ice with sand or salt was his job; he believed at that time that using such chemicals on the barge was illegal because the chemicals would contaminate the river.  (Ayala Dep. at 57, 117.)

Therefore, there are genuine disputes as to material facts concerning whether Ayala was properly trained to remove the ice precluding a finding on summary judgment that Tutor Perini was not negligent.  See Alvarado v. Diamond Offshore Mgmt. Co., No.11cv25, 2011 WL 4915543, at *2 (E.D. La. Oct. 17, 2011) (denying summary judgment because the employer allegedly failed either to provide a safer alternative method of performing the work or "to properly train Plaintiff in proper lifting techniques that would have prevented Plaintiff's injury"); cf. Harrington v. Atl. Sounding Co., 916 F. Supp. 2d 313, 323-24 (E.D.N.Y. 2013) (finding, after trial, negligence of the employer based in part on the lack of instruction and training of the crew including the plaintiff), aff'd in part, vacated in part on other grounds sub nom. Marasa v. Atl. Sounding Co., Inc., 557 F. App'x 14, 18 (2d Cir. 2014), as amended (Jan. 29, 2014).  Accordingly, the Court cannot conclude, on this motion, that Tutor Perini is entitled to exoneration from the Jones Act claim.

**2.**

Ayala also asserts that the barge, bareboat-chartered by Tutor Perini from Hughes, was unseaworthy because Tutor Perini failed to provide a competent crew.  As a matter of general maritime law, an owner or bareboat charterer has "an absolute duty . . . to provide a seaworthy vessel."  Kerr v. Compagnie De Ultramar, 250 F.2d 860, 863 (2d Cir. 1958).  Unseaworthiness may arise from the fact that the vessel is operated by an incompetent or unfit crew.  Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499 (1971); In re Guglielmo, 897 F.2d 58, 61 (2d Cir. 1990); accord Marasa, 557 F. App'x at 18.  Crew members may be found unfit based on lack of training or lack of physical ability or skill.  See id.; Thompson v. Vane Lines Bunkering, 2001 A.M.C. 291, 303 (E.D. Va. 2000).

In this case, Ayala argues that Tutor Perini failed to train him properly for his job and permitted the ice to accumulate on the barge.  In response, Tutor Perini maintains that Mr. Ayala was in fact adequately trained and instructed regarding safety procedures.[10]  These are essentially the same

---

[10] Tutor Perini, represented by same counsel as Hughes, also repeats the same arguments as those made by Hughes and argues that the barge was free of defects and was adequately equipped with non-skid features.  The Court has rejected the arguments of Hughes previously because of evidence in the record raising an issue of fact as to whether the non-skid features existed and were adequate.  See supra Part V.A.  Thus, to the extent that Tutor Perini's argument of seaworthiness is based on the

arguments as those raised by the parties with respect to the Jones Act claim, which the Court has already found to be unpersuasive.[11]   Thus, for similar reasons as those stated above, see supra Part VI.A.1.b, namely, because the evidence on these motions raises a factual issue as to whether Tutor Perini failed to train its crew properly and thus rendered the barge unseaworthy because of the incompetence of the crew, the Court cannot find, on this motion, that Tutor Perini is entitled to exoneration from the claim of unseaworthiness.

---

condition of the vessel, the Court concludes, for the same reasons as those stated previously, that Tutor Perini is not entitled, on this motion, to exoneration on the claim of unseaworthiness based on the defects in the vessel.  While a bareboat charterer is generally not liable for the unseaworthiness of the vessel when a plaintiff's "injury results from unseaworthiness or negligence which existed prior to the delivery of the vessel to the [bareboat] charterer," In re Marine Sulphur Queen, 460 F.2d 89, 100 (2d Cir. 1972), Tutor Perini, represented by the same counsel as Hughes, has not raised this argument, and has not attempted to distinguish between defects that existed before and after the charter began.

[11] A Jones Act claim and a claim for unseaworthiness may overlap completely when "they derive from the same accident and look toward the same recovery."  Saleh v. United States, 849 F. Supp. 886, 893 (S.D.N.Y. 1994) (citing and quoting Gilmore & C. Black, The Law of Admiralty § 6-1, at 272 (2d ed. 1975)).  The claims differ in one important respect: "[a] claim of unseaworthiness under general maritime law, unlike Jones Act liability, does not require a showing of negligence but is rather a species of liability without fault."  Id. (internal citations and quotation marks omitted).

**B.**

The second step of the limitation analysis involves a determination of whether the alleged fault or negligence occurred with the "privity or knowledge" of the vessel owner. In re Moran Towing Corp., 984 F. Supp. 2d at 180. A claimant does not have the burden of showing that the owner has privity or knowledge; rather, it is the owner that bears the burden of showing its lack of privity or knowledge. Otal Investments Ltd, 673 F.3d at 115. Moreover, the owner "need not have had actual knowledge of the unseaworthiness or negligence; it is sufficient that [the owner] 'should have known' of the breach" in order to be found that the owner has had privity or knowledge. In re Moran Towing Corp., 984 F. Supp. 2d at 180 (citation omitted). For limitation of liability purposes,

> [w]here a vessel is held in corporate ownership, the imputation of "privity or knowledge" to the corporate owner will be made if a corporate officer sufficiently high in the hierarchy of management is chargeable with the requisite knowledge or is himself responsible on a negligence rationale. How high is "sufficiently high" will depend on the facts of particular cases.

In re Kinsman Transit Co., 338 F.2d 708, 715 (2d Cir. 1964) (quoting Gilmore & Black, Admiralty at 701 (1st ed. 1957)); accord Cupit v. McClanahan Contractors, Inc., 1 F.3d 346, 348 (5th Cir. 1993). A "corporation is not entitled to limit its

40

liability 'where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred.'"  In re City of New York, 522 F.3d 279, 283 (2d Cir. 2008) (quoting Coryell v. Phipps, 317 U.S. 406, 410 (1943)).

Tutor Perini argues that any negligence of Mr. Ayala's supervisor, Chakides, cannot be imputed to Tutor Perini because Chakides was not high enough in the corporate hierarchy. However, Tutor Perini bears the affirmative burden to establish at trial that negligence occurred without the privity or knowledge of the corporation.  Otal Investments Ltd, 673 F.3d at 115.  In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that "it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable [fact-finder] would be free to disbelieve it."  Surles v. Andison, 678 F.3d 452, 455-56 (6th Cir. 2012) (citation and internal quotation marks omitted); accord Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008).  This is the opposite from the case where the burden of proof at trial is on the nonmoving party--in which case "it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

41

element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted) (emphases added); see Celotex, 477 U.S. at 322-23.

Therefore, on summary judgment, a ship owner or bareboat charterer cannot be deemed to have satisfied its initial burden by simply pointing to one employee and arguing that the claimant's inability to impute privity or knowledge of this one employee to the corporation conclusively establishes the lack of privity or knowledge of the corporation. To the contrary, the ship owner or bareboat charterer must either "show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause," or "exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge." Terracciano, 485 F.2d at 308. Tutor Perini has failed to do either. (Tr. at 32). Accordingly, Tutor Perini's motion for summary judgment seeking exoneration or limitation of liability from the Ayalas' claims is **denied.**

## C.

Tutor Perini also seeks contractual indemnification from Bridge in the event that the Court finds that Tutor Perini is not entitled to exoneration. Tutor Perini moves for summary judgment on that claim, arguing that the evidence clearly establishes that Tutor Perini is entitled to indemnification

from Bridge.  Bridge opposes the motion on the ground that Tutor Perini cannot show that there was any negligence on the part of Bridge and that Bridge is not liable for any negligence of Tutor Perini.

Tutor Perini's indemnification claim is based on its Subcontract Agreement with Bridge (the "Agreement").  (McDermott Decl. Ex. 8.)  The Agreement provides that it is governed by and to be construed under New York law.  (McDermott Decl. Ex. 8 at 24.)  Under New York law, "[t]he right to contractual indemnification depends upon the specific language of the contract.  In the absence of a legal duty to indemnify, a contractual indemnification provision must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed."  Alfaro v. 65 W. 13th Acquisition, LLC, 904 N.Y.S.2d 205, 207 (App. Div. 2010) (citations omitted).

In this case, the indemnity clause of the Agreement provides that:

> To the full extent permitted by law, Subcontractor [Bridge] shall indemnify, defend, and hold harmless Contractor [Tutor Perini] . . . from and against all liability, claims, damages, losses, costs, fines and expenses, (including attorney's fees and disbursements) caused by, arising out of or resulting from the performance of the Work or the acts or omissions of the Subcontractor, . . . provided that any such liability, claim, damage, loss, cost, or expense is caused, in whole or in part, by the negligent act or omission of the

> Subcontractor, its sub-subcontractors or
> anyone directly or indirectly employed by
> any of them or for whose acts any of them
> may be liable when the loss, injury or
> damages arises out of, relates to, is
> connected to, or results from the
> Subcontractor's work. This required
> Subcontractor indemnity specifically does
> not include indemnification for the
> Contractor's own negligence, except to the
> extent permitted by law.

(McDermott Ex. 8 at 20.)

Thus, while Bridge is required by the Agreement to indemnify Tutor Perini for any liability caused by, arising out of, or resulting from Bridge's negligence, Bridge is also not required to indemnify Tutor Perini for any of Tutor Perini's own negligence. The Court has previously held that factual issues exist as to the negligence of both Bridge and Tutor Perini, which preclude summary judgment in favor of Bridge or Tutor Perini on their exoneration or limitation of liability claims. Thus, for the same reason, because triable issues of fact exist with respect to the respective negligence of Tutor Perini and Bridge, Tutor Perini's motion for summary judgment on the indemnification claim is also **denied**. See McLean v. 405 Webster Ave. Associates, 951 N.Y.S.2d 185, 189 (App. Div. 2012).

## VII.

Tri-State moves for summary judgment dismissing the Ayalas' claims under Sections 200, 240(1)-(3), and 241(6) of the New

44

York Labor Law (NYLL).  It is not disputed that Tri-State is neither a ship owner nor a bareboat charterer and is not seeking exoneration or limitation of liability, nor would it be entitled to seek such relief.  At the oral argument, the Ayalas agreed to dismissal without prejudice of its NYLL claims against Tri-State in these proceedings.  (Tr. at 37.)[12]  Accordingly, the NYLL claims of the Ayalas against Tri-State are **dismissed without prejudice**, and Tri-State's motion for summary judgment is **denied without prejudice as moot**.


CONCLUSION

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, the arguments are either moot or without merit.  For the foregoing reasons, the motions for summary judgment of the petitioner Bridge is **granted in part** and **denied in part**; the motions for

---

[12] In a letter submitted to the Court after the oral argument, the Ayalas concede that the Court would have jurisdiction over any state law claims asserted by the Ayalas.  (See Letter to the Ct. on July 11, 2014, Bridge Petition, No. 12cv3536 (S.D.N.Y. July 11, 2014), ECF No. 113.)  However, the letter does not address the withdrawal of the NYLL claims against Tri-State, and any jurisdictional arguments with respect to these claims are moot when no such claims are pending before this Court.  The Ayalas clarified at the argument of these motions that they had not asserted any NYLL claims against any party other than Tri-State.  (Tr. 9.)  Tri-State also claimed that it moved for summary judgment dismissing a cross claim by Bridge against it, but it is unclear that such a cross claim was actually made and, in any event, the motion was not completely briefed.  (Tr. 44-45.)  Any such motion is therefore denied without prejudice.

summary judgment of petitioners Hughes and Tutor Perini are **denied.**

In addition, the NYLL claims of the Ayalas against Tri-State are **dismissed without prejudice**, and the motion for summary judgment of Tri-State is **denied without prejudice as moot.  The Clerk is directed to close all pending motions in cases Nos. 12cv3536, 12cv6285, and 13cv3123.**

SO ORDERED.

Dated:    New York, New York
          August 9, 2014        _____/s/_____
                                     John G. Koeltl
                              **United States District Judge**