UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------

In re

Bridge Construction Services of          12-cv-3536 (JGK)
Florida, Inc., Hughes Bros, Inc.,        12-cv-6285 (JGK)
and Tutor Perini Corp.,                  13-cv-3123 (JGK)

Petitioners.                             OPINION AND ORDER

--------------------------------------

JOHN G. KOELTL, District Judge:

   This case concerns an incident that occurred on December
15, 2010 when Jose Ayala ("Ayala") fell off a barge at the
Tappan Zee Bridge into the Hudson River.  At that time, Tutor
Perini Corporation ("Tutor Perini") was the general contractor
on a project to rehabilitate the bridge.  In order to perform
the work, Tutor Perini chartered various barges from Hughes
Bros., Inc. ("Hughes") that were used as floating work
platforms. Various workers, including electricians, worked on
the barges on which their tools, equipment, and supplies were
also stored.  See generally Bridge Construction Services of
Florida Trial Exhibits ("Bridge Trial Ex.") 4, 5, 8, and 9.  One
of the barges that Tutor Perini chartered from Hughes was the
HUGHES 660.

   Tutor Perini entered into several subcontracts with various
entities to perform work on the project.  Tutor Perini entered
into a subcontract with Bridge Construction Services of Florida,

Inc. ("Bridge") to provide, among other things, a tug and other boats needed for the project.  Tutor Perini also entered into a subcontract with Tri-State Electrical ("Tri-State") to provide electricians and materials that were needed on the project.

Pursuant to its subcontract with Tutor Perini (the "Tutor Perini-Bridge Subcontract"), Bridge provided a tug, the BRUCE RUSSELL, to be used in connection with work on the Tappan Zee Bridge project.  On December 15, 2010, electricians from Tri-State were installing an electrical conduit along the Bridge and were working from the HUGHES 660 barge.  The tug BRUCE RUSSELL was used to ferry the Tri-State electricians to the HUGHES 660 and then to move the HUGHES 660 beside the bridge so that the electricians could continue to install the electrical conduit along the bridge.

Ayala, a worker employed by Tutor Perini, was the sole deckhand on the HUGHES 660. At some point in the process of moving the HUGHES 660 along the Tappan Zee Bridge to a new position, Ayala fell into the river.  Both Tutor Perini and Bridge claim that Ayala's fall was due to the fault of the other party.  Bridge claims that Tutor Perini was responsible for the fall because, among other reasons, Ayala slipped on the icy surface of the barge, Tutor Perini failed to keep the barge clear of ice, Ayala should have cleared the ice, and Ayala

ignored his training and was not properly trained.  Tutor Perini claims that Bridge is responsible for Ayala's fall because the tug was under the command of an unlicensed captain who failed to maintain sufficient communication with Ayala and who was responsible for bumping the barge and causing Ayala's fall.

Both Bridge and Tutor Perini have settled with Ayala and now seek indemnification from the other party.  The Court held a non-jury trial from January 6, 2016 through January 12, 2016. Having reviewed the evidence and assessed the credibility of the witnesses, the Court makes the following Findings of Fact and reaches the following Conclusions of Law.

## FINDINGS OF FACT

### Background

1.    In December 2010, the Tappan Zee Bridge which spans the Hudson River was undergoing renovations, and Tutor Perini was the general contractor responsible for the renovation project. See Joint Pre-Trial Order dated November 16, 2015, ECF Document No. 180, ("JPTO"), at 6.

2.    In connection with the project, Tutor Perini entered into a bareboat charter with Hughes and leased from Hughes several barges including the HUGHES 660, the barge that was later involved in the incident in this case.  See JPTO at 6.  Upon signing the bareboat charter party agreement and taking

possession of the barge, Tutor Perini became the de-facto owner
of the barge and took over responsibility for the barge from
Hughes.  See Trial Transcript ("Tr.") at 414-16; see also Hughes
Bros./Tutor Perini's Final Exhibit List ("Tutor Perini Trial
Ex.") B.

3.    The barges were used as working platforms from which
various contractors, including Tri-State electricians, performed
work on the Tappan Zee Bridge.  See JPTO at 6.

4.    Perini also hired Bridge, which supplied and operated a
tugboat that would move the barges when needed.  The tugboat,
the BRUCE RUSSELL, was involved in the incident in this case.
See JPTO at 6; see also Tutor Perini Trial Ex. C.

5.    The BRUCE RUSSELL was owned by non-party Workboat Services,
Inc., and was operated by Kenny Kling ("Kling"), a Bridge
employee.  See JPTO at 6.

6.    On December 15, 2010, while working on the Tappan Zee
Bridge project, Ayala fell off the HUGHES 660 barge into the
Hudson River.  Ayala contends that he lost his footing when the
barge was jolted by the BRUCE RUSSELL.  See In re Bridge Const.
Servs. of Florida, Inc., No. 12cv3536 (JGK), 2015 WL 6437562, at
*1 (S.D.N.Y. Oct. 24, 2015) ("Bridge II").  Tutor Perini
contends that Bridge was responsible for the fall because the
tug was operated by Kling, an unlicensed captain who failed to

- 4 -

exercise reasonable care, including maintaining proper communications with Ayala when the tug was moving the barge. Bridge contends that Ayala's fall was caused by the icy conditions on the barge and that Ayala, an employee of Tutor Perini, had the obligation to clear the ice but failed to do so.

7.   Prior to the trial, Tutor Perini and Hughes settled Ayala's claims against them for the total amount of $539,448.97.  See Tutor Perini Trial Ex. F.

8.   Prior to the trial, Bridge settled Ayala's claims against it for the total amount of $225,000.00.  See Bridge Trial Ex. 28.

9.   The total settlement amount that Ayala received for his claims against Hughes, Tutor Perini, and Bridge was $794,448.97.

10.  These consolidated cases began with separate petitions for exoneration or limitation of liability by Bridge, Hughes, and Tutor Perini pursuant to 46 U.S.C. §§ 30501, et seq. The extensive procedural history of this case is detailed in the prior opinions of this Court, familiarity with which is assumed. See Bridge II, 2015 WL 6437562, at *1-2; In re Bridge Const. Servs. of Florida, Inc., 39 F. Supp. 3d 373, 378-80 (S.D.N.Y. 2014) ("Bridge I").  Now that all of the claims by Ayala have been settled, the remaining claims that were tried and remain to be decided are as follows: (1) Tutor Perini's contractual

- 5 -

indemnification claim against Bridge pursuant to Section 11.1 of the Tutor Perini-Bridge Subcontract; (2) Bridge's common law indemnification claim against Tutor Perini and Hughes; and (3) Bridge's contractual indemnification claim against Tutor Perini based on Change Order No. 001 to the Tutor Perini-Bridge subcontract.

### Tutor Perini-Bridge Subcontract

11.  Tutor Perini and Bridge were parties to a Subcontract Agreement dated August 5, 2010.  Tutor Perini Trial Ex. C. Under the Tutor Perini-Bridge subcontract, Bridge was required to provide a crew boat and a twin diesel tug and licensed captains to work on the Tappan Zee Bridge project.  See Tutor Perini Trial Ex. C (Schedule of Payments); Tr. at 329.  Bridge contracted to provide vessels to shift barges and/or equipment at the Tappan Zee Bridge project.  See Tutor Perini Trial Ex. C; Tr. at 544. Under the terms of the Tutor Perini-Bridge subcontract, if required by Tutor Perini, Bridge was also required to supply a barge deckhand.  See Tutor Perini Trial Ex. C (Schedule of Payments).

12.  The tug's primary function was to shift barges according to Tutor Perini's instructions at the Tappan Zee Bridge project. See Tutor Perini Trial Ex. C; Tr. at 544.

13.   The Tutor Perini-Bridge subcontract contains a broad
indemnification clause in which Bridge agreed to indemnify Tutor
Perini for any liability arising from Bridge's negligence, but
excluding any indemnification for Tutor Perini's own negligence.
More specifically, Section 11.1 of the Subcontract provided:

> To the fullest extent permitted by law,
> Subcontractor [Bridge] shall indemnify, defend and
> hold harmless Contractor [Tutor Perini] . . . from and
> against all liability, claims, damages, losses, costs,
> fines and expenses, (including attorney's fees and
> disbursements) caused by, arising out of or resulting
> from the performance of the Work or the acts or
> omissions of the Subcontractor, its sub-subcontractors
> or anyone directly or indirectly employed by the
> Subcontractor or any of its sub-subcontractors or for
> whose acts the Subcontractor or any of its sub-
> subcontractors may be liable; provided that any such
> liability, claim, damage, loss, cost, or expense is
> caused, in whole or in part, by the negligent act or
> omission of the Subcontractor, its sub-subcontractors
> or anyone directly or indirectly employed by any of
> them or for whose acts any of them may be liable when
> the loss, injury or damages arises out of, relates to,
> is connected to, or results from the Subcontractor's
> work.   This required Subcontractor indemnity
> specifically does not include indemnification for the
> Contractor's own negligence, except to the extent
> permitted by law. Such obligation shall not be
> construed to negate or otherwise reduce any other
> right or obligation or indemnity, which would
> otherwise exist.

Tutor Perini Trial Ex. C at 20.

14.   Under the terms of the Subcontract, Tutor Perini had the
right to terminate unilaterally the barge deckhand employed by
Bridge.  <u>See</u> Tutor Perini Trial Ex. C (Schedule of Payments).

- 7 -

In August 2010, Tutor Perini discontinued the practice of using a deckhand provided by Bridge and instead supplied its own employee to work as a deckhand on the barges.  See Tr. at 245-46.  Bridge did not have any input into whom Tutor Perini selected to be a deckhand on the barges.  Tr. at 548.  The new deckhand was an employee of Tutor Perini, was not provided with any training by Bridge, and was not provided with any equipment from Bridge.  Tr. at 548.  Tutor Perini did not ask Bridge to train the deckhand or provide the deckhand with any equipment.  Tr. at 599-600.  In light of Tutor Perini's decision to use its own deckhand, Bridge sought indemnification for any negligence or damage occurring as a result of any act or omission of Tutor Perini's employees.  Tr. at 546, 596-97.  On September 3, 2010, Change Order No. 1 to the Tutor Perini-Bridge subcontract was executed setting forth the terms of Tutor Perini's obligation to indemnify Bridge.  See Tutor Perini Trial Ex. C (Change Order). The Change Order provides:

> Tutor Perini Corporation will indemnify Bridge Construction Services, Inc. for claims arising solely out of negligent acts or omissions of its personnel or invitees in connection with the use of Bridge Construction Services, Inc. vessel "Bruce Russell"

Tutor Perini Trial Ex. C at 3.

15.  Bridge and Tutor Perini understood that the indemnity language in Change Order No. 1 to the Subcontract meant that, in

order for Tutor Perini to indemnify Bridge, Tutor Perini would have to be solely responsible for any negligent acts or omissions.  See Tr. at 597, 598, 633.

16.  While both Tutor Perini and Bridge point to the responsibility of the other party for providing for Ayala's safety on the date of the incident, it is plain that both bore responsibility for different aspects of his safety.  Tutor Perini was particularly responsible for training Ayala and providing that he followed safety measures to make his workplace safe and free of ice, and Bridge bore responsibility for providing that its captain operated the tug in a safe fashion and that the captain provided sufficient oversight of Ayala while Ayala was working on the barge that the tug was moving.

17.  It is undisputed that Ayala was hired by Tutor Perini to work as a barge deckhand and that all the training he received was provided by Tutor Perini supervisors and employees.  Kling, who was operating the tug neither could, nor did, provide any training to Ayala when Ayala began to work as a deckhand. Instead, Ayala received all his instructions from his predecessor, Carlos Valdovinos ("Valdovinos"), over one and-a-half days.  Tr. at 123-24; Tr. at 33.  Ayala testified that he was hired by Tutor Perini and trained by their personnel.  Tr. at 25-27.

18.   On or about December 10, 2010, Ayala was called by his
union and told to report to Tutor Perini's offices to work for
Tutor Perini.  When he got to the offices, he was shown a safety
video, which he watched.  Tr. at 25.  The video covered general
safety at the work site and did not address working on a barge
or on the water.  Tr. at 25-26.  Ayala met Mark Chakides
("Chakides"), Tutor Perini's supervisor.  Chakides took Ayala to
the barge where he met Valdovinos, whom Ayala would be
replacing.  Tr. at 26.  Chakides instructed Ayala that he should
work with Valdovinos to learn how to handle shifting barges and
tying them up.  Tr. at 303-04, 318.  Ayala's native language is
Spanish, and he speaks only broken English.  Tr. at 334.
Valdovinos then showed Ayala the procedure for untying barges
that needed to be shifted and how to retie them once they were
moved to a new location.  Ayala and Valdovinos communicated in
Spanish when Valdovinos taught him the job.  Tr. at 27.  Ayala
was taught to do this work by first watching Valdovinos and then
doing the work himself.  Tr. at 27.

19.   David Ackerman ("Ackerman"), the Tutor Perini Assistant
Superintendent, was familiar with the duties of a barge deckhand
and in particular was aware that a barge deckhand should not
approach the edge of the barge while that barge was in motion
and not resting against wooden pilings, also known as

"dolphins."[1]  Ackerman stated that a barge deckhand should not approach the edge of a moving barge and only go to the edge after the barge was resting against the dolphins.  Tr. 342-43.

20.  After Ayala watched the safety video when he arrived at the Tappan Zee Bridge, he was given a "site specific safety plan" briefing from Shane McCullen, the Safety Superintendent, about working on the water, on a bridge, and at heights.  Tr. at 359-60.  Laborers, such as Ayala, were told to be very careful working on the edge of the barge and were told not to stand on ice while working.  Tr. at 360-61.  Valdovinos should have instructed Ayala that it was his duty to remove ice if there was any on the decks of the barges.  Tr. at 362-363.

21.  David Milner ("Milner"), a Tutor Perini employee and safety representative, also testified that he regularly told laborers like Ayala that they should not stand at the edge of the barge while it is in motion and should stand, instead, at the center of the barge until the barge is up against the dolphins.  See Tr. at 516-517.  Milner testified that he heard Kling give

_____

[1] In this context, a "dolphin" is a wooden structure that abuts the concrete pillars that support the bridge.  It is composed of numerous wood pilings that look like telephone poles rising out of the water that were driven into the river bed and wrapped with thick cable.  A dolphin is meant to protect the bridge pillars from ice and from vessels that may collide with the bridge pillars.  Each dolphin was spaced approximately thirty feet apart on the section of the bridge where there is a low roadway.  See Tr. at 4-5; Bridge Trial Exs. 4, 6-7, 10.

similar instructions to individuals working with him.  Tr. at 515-16.  It is unclear from the testimony if Milner gave those instructions to Ayala specifically.

22. Bruce Sweet ("Sweet"), Bridge's owner, who resides in Florida, only visited the Tappan Zee Bridge project once in five or six years.  Tr. at 576-77. Sweet acknowledged that Kling was Bridge's "man on the job" during the incident in December 2010. Tr. at 577.  Sweet gave Kling authority to make decisions on a daily basis for Bridge pertaining to the project.  Prior to giving Kling that authority, Sweet never asked Kling if he was a licensed tugboat captain.  Tr. at 210, 577, 578.  In fact, Kling was not licensed by the Coast Guard to operate the BRUCE RUSSELL.  Tr. at 112.

23. Bridge was responsible for the safe navigation of the tug and the barge when the vessels were underway, which included the movement of the barge that the tug was pushing until the barge was completely tied to moorings and was stationary. Tr. at 591-92.  King was responsible for the safety of the crew and guests during navigation, including Ayala. Tr. at 593; see also Tr. at 174-75.

24. The captain is also responsible for ensuring gear needed for the safety of the crew and passengers is present aboard the vessel and in good working order. Tr. at 176.

25.  Kling began working as a tugboat captain on the Tappan Zee
Bridge project in the middle of November 2010, roughly three
weeks before the incident at issue here. Tr. at 171.  Kling's
last training on the operation of tugs was in the early 1990s
when he was Sweet's deckhand.  Tr. at 169-70.

26.  Although Kling knew he needed a license to captain the
tugboat, Tr. at 180, on December 15, 2010, Kling did not hold a
United States Coast Guard license.  Tr. at 112.

27.  One of the prerequisites for taking the test to become a
licensed captain was completing a ten-day course, in which
general seamanship rules were taught.  Tr. at 174.  Kling had
not yet taken the prerequisite ten-day course in general
seamanship.  Tr. at 174.

28.  In sum, at the time of the incident, the BRUCE RUSSELL was
registered with the United States Coast Guard under the name of
Workboat Services, Inc., a defunct entity, and it was being
operated by an unlicensed captain.  Tr. at 576.

29.  Kling was Ayala's supervisor from the minute Ayala got on
the tug until he got off, and Ayala did whatever Kling told him
to do.  Tr. at 98-99; see also Tr. at 46.

30.  The relative positions of the HUGHES 660, the BRUCE
RUSSELL, the Tappan Zee Bridge, and the dolphins on the day of
the incident is established by Bridge Trial Ex. 29 and the

testimony of the parties.  To summarize, on the day of the incident, the Tappan Zee Bridge and the HUGHES 660 were parallel to each other, the barge sitting on the south side of the bridge.  When the barge was at rest, it was tied to two dolphins, one in the fore (referred to as "Point A") and one at the aft of the barge ("Point B").  The tug, which was also parallel to the barge, was tied to the starboard side of the barge, facing east.  See generally Bridge Trial Ex. 29.

31.  As the workers laid conduit along the bridge, the BRUCE RUSSELL moved the HUGHES 660 along the bridge in a kind of shifting maneuver.  Kling explained that, after one end of the barge was tied off onto a dolphin, he would reverse gears, twist in the opposite direction, and then use the tug to push the other end of the barge toward the other dolphin.  Tr. at 118.

32.  During the maneuver, a deckhand would come to the edge of the barge to tie and untie the barge to the dolphins.  Tr. at 512.  The deckhand would have to reach over from the corner of the barge to complete the tying and untying.  See Tr. at 274.

33.  The tying and untying operation is a "time thing."  Kling described how, while he could not always see Ayala, he would anticipate how long it would take him to walk along the barge, and he (Kling) would move the tug when he believed Ayala was in the correct position.  Tr. at 237.

34.  According to Kling, a good captain and good deckhand that
have worked together for a long period of time do not need to
communicate during the shifting maneuver because each knows what
the other is going to do and when he needs to do it, based upon
experience.  Tr. at 124, 231.

35.  Chakides personally observed Bridge's prior tug captain,
Jim White ("White"), communicating with his deckhand by a
handheld walkie-talkie.  Tr. at 316-17.  Kling testified that on
the day of the incident, Ayala did not have a walkie-talkie.
Tr. at 189.

36.  David Daoust ("Daoust"), who was the Superintendent for the
Tappan Zee Bridge project in December of 2010, also observed
White, when he was captain, communicating with the prior
deckhand with two-way marine radios and through the public
address system on the tug's wheelhouse.  Tr. at 397; see also
Bridge Trial Ex. 2.

37.  Sweet, who had a Coast Guard captain's license at the time
of the incident, testified that in his experience, during the
course of moving a barge such as the HUGHES 660, the captain of
the tug would have to communicate with the deckhand about such
things as when the barge was going to move, when the rope was
going to be taken off, and when the rope was going to be put
back. Tr. at 535, 557.

<u>December 14, 2010 Incident</u>

38.  The day before the incident at issue in this case, Ayala also fell into the water.  On December 14, 2010, while tying up a barge underneath the bridge, Ayala slipped on a combination of ice and/or water and mud and fell off a concrete surface on the abutment of the bridge.  <u>See</u> Tr. 4, 105-06, 127-28.

39.  After the December 14 incident, Kling spoke to Chakides and expressed his concern that Ayala may not be physically able to do the job and that there was a language barrier because Ayala spoke Spanish and some English and Kling only spoke English. Nevertheless, Kling was told that he would have to continue working with Ayala.  Tr. at 129.

40.  Kling also spoke to Sweet to tell him that Ayala fell into the water and that he was concerned that Tutor Perini was not filling the deckhand position with the proper person. Tr. at 129-30; <u>see also</u> Tr. at 553.

41.  Sweet then contacted Tutor Perini and probably spoke to Daoust to voice his concerns about the communication barrier between Ayala and Sweet.  Tr. at 553-54.  Sweet's concern was that if a situation developed out of the ordinary while moving a barge, Kling would not be able to communicate with Ayala.  Tr. at 557.

42.   Daoust testified that he learned of Ayala's accident on December 14 from Chakides and that afterward he directed that at the next morning's safety meeting, known as a "Take Five" meeting, Chakides give a specific briefing to the workmen concerning slipping on barges and ice and preventing falls into the river.  Tr. at 363-64, 380-81.

43.   After the first fall, Tutor Perini did not require Ayala to attend any additional safety classes or training aside from the Take Five meeting the next morning, which was given to all the workers.  Tr. at 305.

### December 15, 2010 Incident

44.   The parties' versions of how Ayala fell into the water on December 15, 2010 differ.  Tutor Perini and Hughes attempt to place all the blame on Kling for bumping the barge and causing Ayala to fall while Bridge maintains that the barge had actually stopped its motion and was against the dolphins when Ayala simply slipped on ice on the barge, ice that Ayala should have cleared beforehand.  It is clear by more than a preponderance of the evidence that a confluence of factors contributed to the fall, including the bump from the tug as well as the icy condition that had not been cleared by Ayala as it should have been.  Moreover, the inability of Kling to see Ayala on the edge of the barge and to coordinate with him contributed to the

accident.  While it is plain that some of Ayala's testimony was
exaggerated, there is sufficient credible corroborating
testimony to support the conclusion that a combination of
factors caused Ayala to fall into the water.

45.  On December 15, 2010, Ayala fell when Kling bumped the
barge as Ayala was attempting to tie the front end of the barge
to the dolphin.  Tr. at 55-56

46.  Despite the fact that Ayala reportedly moved slower than
Valdovinos, Tr. at 453, and that the shifting maneuver relies on
experience and timing, when Kling started pushing the barge, he
did not know where Ayala was and did not use a walkie-talkie or
other device to communicate with Ayala. Tr. at 238; Tr. at 189.

47.  Ayala did not expect Kling to push the barge with the
particular speed he did. Tr. at 62-63, 65.

48.  While Ayala did not see the tug impact the barge, he felt a
forward bump, distinct from the "up and down" motion resulting
from the river's current.  Tr. at 75-77. 104.

49.  Ayala fell in the direction of the bridge because Kling was
pushing with the tug.  Tr. at 77, 104

50.  Ayala had not yet finished tying up the barge at the time
of the fall.  Tr. at 251.  The movement of the barge is complete
only when the barge is tied up.  Tr. at 251.  Therefore, the
movement of the barge was not complete at the time of Ayala's

fall, and his safety was Bridge's responsibility.  While the barge was tied up at its rear, it had not yet been secured to the front of the barge when Ayala fell in the process of attempting to tie it up.

51.  Andrew Reeves ("Reeves"), one of the Tri-State electricians, was working on the barge on December 15, 2010 when Ayala fell into the water.  Tr. at 283.  He did not see Ayala fall.  Tr. at 286.  Reeves saw that Ayala was at the edge of the barge, although he did not know the exact placement of Ayala's feet at the time of Ayala's fall.  Tr. at 290-91.  He felt a bump while the barge was still moving, looked back, and then noticed that Ayala was gone.  Tr. at 290.  Reeves testified that Ayala fell when the bump occurred, Tr. at 291, and at that time, the barge had not yet come to a stop against the pilings.  Tr., at 289

52.  Two other Tri-State employees, Thomas Conese and Thomas Damiani, did not see Ayala fall into the water.  Tr. at 453, 462, 471.

53.  Kling gave a contemporaneous statement, the import of which is that the tug was moving the barge at the time of Ayala's fall.  On December 17, 2010, Kling gave the following written statement:

> On Wednesday, December 15, I was shifting a 30 by 90 barge down to the east. As I was pushing barge back to the bridge, Jose fell off the north side of the barge into the water. He was pulled out by the crew on the barge, brought to dockside. Kenny Kling, tug captain.

Tr. at 140.

54.  Kling threw out the vessel's logbook sometime after he learned that Ayala may file a lawsuit.  Tr. at 245-46.  A fair inference from Kling's destruction of the log book is that it would have been adverse to his position in this case, in particular, that it would have supported the position of the other parties that the tug had not stopped pushing the barge at the time of the incident but rather that it was in the process of pushing the barge when Ayala fell.

55.  While Kling testified at trial that the barge was not moving at the time that Ayala fell and that it was "hard up against the piles," that testimony was not credible.  Tr. at 95-96.  The evidence and credible testimony indicates that Kling was pushing the barge at the time Ayala fell.  Tr. at 268.

56.  Kling could not see Ayala from midship of the barge up to the front of the barge, or Point A of Bridge Trial Ex. 29.  See Tr. at 237.  From his vantage point on the tug, Kling could not see Point A on the barge, which is the location in which Ayala testified he was standing.  Tr. at 141.

57.  Kling could not see the "piles" or dolphins at the time Ayala fell. Tr. at 255.

58.  Kling could not see Ayala when he fell.  Tr. at 239-40.

59.  As such, Kling could not provide any information about how or why Ayala fell.  Tr. at 241.

60.  Kling was an inexperienced tug captain.  Tr. at 230.

61.  According to Kling, Ayala was an inexperienced deckhand, based upon Kling's knowledge that Ayala had only been a deckhand for three days at the time of the incident, as well as Kling's observations of Ayala.  Tr. at 227, 229-30.

62.  Where a tug captain and a deckhand are experienced at working together, they may be able to conduct the barge's tie-up maneuver without communicating.  But Kling and Ayala were not experienced at working together; therefore, they needed to communicate to execute the maneuver safely.  Tr. at 231.

63.  Kling told Milner that Kling was pushing the barge into place when Ayala fell off the barge.  Tr. at 519-20.

64.  Bridge attempts to avoid liability by blaming Ayala for his fall and claiming that Ayala slipped on ice that Ayala should have cleared.  Tutor Perini and Hughes contend that Ayala did not slip on ice and Ayala testified that he could not recall seeing any ice on the deck of the barge at the location where he fell on December 15, 2010.  Tr. at 64-65, 68, 84.  Kling was not

able to see if there was ice in the area where Ayala was
standing.

65.  However, Reeves, a disinterested and credible witness,
observed ice around the edges of the barge and saw ice where
Ayala was standing when he fell.  Tr. at 287-88.  Reeves
testified credibly that "it's cold out, it's wintertime, it
rains, ice freezes, it's a steel barge."  Tr. at 288.

66.  There was salt or ice melt on the barge, and it was Ayala's
responsibility to apply it to any icy spots.  Tr. at 288; see
also Tr. 141-42.  Ayala was not credible when he testified that
he was told not to use such materials to remove ice on decks and
that he had no responsibility to remove ice.  Tr. 37-38.

67.  Tutor Perini prepared two reports of the incident, each
signed by Daoust, each prepared at least within two days of the
accident.  In one report titled "Post Incident Review," Daoust
notes "Slippery Conditions," and states that the contributing
factors were as follows: "Not sure of contributing factors since
nobody actually saw him fall. . . . From pictures of the barge,
there is visible water standing on the deck 2 days later. It is
possible he slipped on ice and fell in."  Bridge Trial Ex. 15.
In another report titled "Accident/Incident Report," Daoust
writes: "Jose was the deckhand for the tugboat and was in the
process of tying up a barge. He was too close to the edge of the

barge, lost his balance and fell in the water." Bridge Trial Ex. 19.

68.  Because the barge had not yet come to rest against the dolphins (or pilings), a fair inference from the evidence is that Ayala was in fact standing too close to the edge of the barge at the time that he fell.  It is also clear that Kling was unable to observe where Ayala was at the time of the fall and did not communicate with him during the shifting maneuver of moving the barge.

### DAMAGES

69.  Prior to the trial, Tutor Perini/Hughes and Ayala settled for the total amount of $539,448.97. <u>See</u> Tutor Perini Trial Ex. F.

70.  Prior to the trial, Bridge and Ayala settled for the total amount of $255,000.00. <u>See</u> Bridge Trial Ex. 28.

71.  The total amount Ayala received in settlement of his claims against Tutor Perini, Hughes, and Bridge in this matter was $794,448.97.

### CONCLUSIONS OF LAW

1.  This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. §§ 1333(1) and 1367(a).

<u>Bridge's Obligation to Indemnify Tutor Perini</u>

2.   The Tutor Perini-Bridge Subcontract provides that it is governed by and should be construed under New York law.  See Tutor Perini Trial Ex. C; see also Bridge II, 2015 WL 6437562, at *4.

3.   Under New York law, "'[t]he right to contractual indemnification depends upon the specific language of the contract. In the absence of a legal duty to indemnify, a contractual indemnification provision must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed.'"  Bridge II, 2015 WL 6437562, at *4 (quoting Alfaro v. 65 W. 13th Acquisition, LLC, 904 N.Y.S.2d 205, 207 (App. Div. 2010)); see also Heimbach v. Metro. Transp. Auth., 553 N.E.2d 242, 246 (N.Y. 1990) (contractual language has to evince an "unmistakable intention" to indemnify before a court enforces such an obligation).

4.   Section 11.1 of the Tutor Perini-Bridge Subcontract requires Bridge to indemnify Tutor Perini for any liability arising from Bridge's negligence.  See Findings of Fact No. 13; see also Bridge II, 2015 WL 6437562, at *4.

5.   The elements of a claim of negligence under maritime law are the same as the elements of negligence under New York Law. "Under New York law . . . a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of

- 24 -

a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000) (per curiam) (quoting Akins v. Glens Falls City Sch. Dist., 424 N.E.2d 531, 535 (N.Y. 1981)).

6.    Bridge owed a legal duty to both Ayala and Tutor Perini to perform the safe navigation of the tugboat and barge at the Tappan Zee Bridge project in December 2010, and more specifically, on December 15, 2010.

7.    Bridge breached its duty by having Kling, an unlicensed captain, operate the tugboat on December 15, 2010.  Thus, Bridge violated 46 C.F.R. § 15.605, which requires that "[e]ach uninspected passenger vessel (UPV) must be under the direction and control of an individual credentialed by the Coast Guard." 46 C.F.R. § 15.605.  Tutor Perini argues that Bridge's violation of 46 C.F.R. § 15.605 on December 15, 2010 constituted negligence *per se*.  Whether that violation should be considered negligence *per se*, see, e.g., Reyes v. Vantage S.S. Co., 609 F.2d 140, 143 (5th Cir. 1980); Brown v. Reinauer Transp. Companies, LLC, 886 N.Y.S.2d 769, 772 (App. Div. 2009), is unnecessary to decide.  The violation is at least persuasive evidence of negligence on behalf of Kling. See, e.g., Chen v.

United States, 854 F.2d 622, 627 (2d Cir. 1988); Pasternack v. Lab. Corp. of Am., 892 F. Supp. 2d 540, 555 (S.D.N.Y. 2012).

8.   Kling did not have a visible sightline to Ayala and failed to communicate with Ayala during the shifting operation on December 15, 2010.   Accordingly, he did not exercise ordinary care, caution, and maritime skill in his operation of the tugboat and barge on December 15, 2010.   See Bridge I, 39 F. Supp. 3d at 383.

9.   In The Pennsylvania, 86 U.S. 125 (1874), the United States Supreme Court held:

> [W]hen . . . a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

Id. at 136.

10.  Under the "Pennsylvania Rule," the burden of disproving causation shifts to Bridge.   Bridge II, 2015 WL 6437562, at *8; Dover Barge Co. v. Tug Crow, 642 F. Supp. 2d 266, 274 (S.D.N.Y. 2009).

11.  The "Pennsylvania Rule" "originally 'applied only to cases involving collisions between ships, but has been extended to

apply to any statutory violator who is a party to a maritime accident.'" <u>Bridge II</u>, 2015 WL 6437562, at *8.

12.   The "Pennsylvania Rule" holds that a vessel guilty of a statutory fault is presumed to have contributed to the accident and can only escape liability if she shows that she could not have contributed to causing the collision.  <u>See, e.g.</u>, <u>Dover Barge</u>, 642 F. Supp. 2d at 274; <u>Sinclair Ref. Co. v. The Morania Dolphin</u>, 170 F. Supp. 586, 590 (S.D.N.Y.) (Weinfeld, J.), <u>aff'd sub nom.</u>, <u>Sinclair Ref. Co. in Possion of the P.W. Thirtle v. the Morania Dolphin & the Dalzelleader & Edna M. Matton</u>, 272 F.2d 192 (2d Cir. 1959).  Although the rule speaks of a statutory violation, it is equally applicable to violations of federal regulations.  <u>See, e.g.</u>, <u>Folkstone Mar., Ltd. v. CSX Corp.</u>, 64 F.3d 1037, 1046 n.5 (7th Cir. 1995).

13.   "Three elements must exist for the Pennsylvania Rule to apply: (1) proof by a preponderance of the evidence of a violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." <u>Dover Barge</u>, 642 F. Supp. 2d at 274 (citing 2 Thomas J. Schoenbaum, The Law of Admiralty § 14–3, at 102 (4th ed. 2004)).

14.  These elements are met here.  First, it is without dispute that Kling was unlicensed while he was operating the tugboat at the time of the incident and that Kling's failure to have a license at the time of the incident violated the United States Coast Guard regulation requiring him to be licensed.  Ins. Co. of N. Am. v. John J. Bordlee Contractors, Inc., 532 F. Supp. 774 (E.D. La. 1982), aff'd sub nom., Ins. Co. of N. Am. v. Bd. of Comm'rs of Port of New Orleans, 733 F.2d 1161 (5th Cir. 1984) (applying "Pennsylvania Rule" where unlicensed person was operating uninspected towing vessel, in violation of statute).  Second, the United States Coast Guard requirement that a tug operator be licensed plainly involves marine safety and navigation.  The regulation is meant to assure that the tug is safely operated, including operated in a manner that is safe for the people working on or in connection with it.  Third, the injuries suffered by Ayala as a result of being caused to fall off of the barge due to the tug's impact with the barge is of the nature that the regulation was intended to prevent.

15.  The credible evidence from Ayala and Reeves supports the conclusion that the tug's impact with the barge was a cause of Ayala's fall.  Moreover, the fall occurred while Kling failed to exercise due care to assure the safety of Ayala because he could not see Ayala and did not know where Ayala was on the vessel.

Kling could not reasonably communicate with Ayala while the tug was maneuvering the barge into the dolphins.   Further, Bridge was aware that it was likely unsafe to proceed with Ayala as the deckhand on the tug.   Ayala had fallen into the river the day before the incident in question, which was such an unusual and troubling occurrence that Sweet, Bridge's President, took the issue up with Tutor Perini, but Bridge proceeded to use Ayala despite the warning of his possible unfitness to act as a deckhand on the tug and barge.

16.   Furthermore, Bridge's spoliation of evidence, namely the destruction of Kling's log book warrants an adverse inference that the evidence contained in the log book would have been unfavorable to Bridge, and, conversely, favorable to Hughes and Tutor Perini.   Sanctions for the spoliation of evidence are appropriate in this Circuit where: (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) [ ] the records were destroyed 'with a culpable state of mind'; and (3) [ ] the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002).

17.   The recent Amendments to Rule 37(e) of the Federal Rules of Civil Procedure have changed the rules relating to spoliation when it involves Electronically Stored Information ("ESI").  In particular, it overruled Residential Funding because no adverse inference instruction is available unless the proponent of the request for the instruction demonstrates that the party who destroyed the ESI acted with the intent to deprive another party of the information's use in the litigation.  However, the change in Rule 37(e) applies only to ESI and therefore does not affect the standard in Residential Funding as it relates to this case which concerns physical evidence, namely the notebook or log book, and not ESI.

18.   Bridge has argued that sanctions should not be imposed. Bridge argues that Kling was not an officer or director of Bridge.  That is plainly irrelevant.  He was certainly an employee of Bridge and therefore an agent of Bridge to the extent that he was acting within the scope of his employment. Bridge has argued also that the notebook was simply a personal notebook.  But that is irrelevant because Kling was plainly recording matters observed in the course of his employment, and indeed he testified at his deposition that the notebook itself was kept by the previous Captain of the tug, and Kling continued to use it.

19.  Bridge has suggested that Kling did not destroy the notebook in the course of his employment, but the evidence establishes otherwise.  He kept the entries in the regular course of the business and the testimony supports the fact that it related to business matters---the movement of the barges---and that therefore the maintenance or lack of maintenance of the book was part of the business of his employer.  Bridge does not dispute that Kling destroyed the notebook after becoming aware that Ayala might sue.

20.  Therefore, Kling destroyed the notebook after litigation was anticipated, and thus at a time when he had an obligation to preserve the evidence.  See, e.g., Kronisch v. United States, 150 F.3d 112, 126-27 (2d Cir. 1998); Skyline Steel, LLC v. PilePro, LLC, 101 F. Supp. 3d 394, 407-08 (S.D.N.Y. 2015), on reconsideration in part, No. 13cv8171 (JMF), 2015 WL 3739276 (S.D.N.Y. June 15, 2015).

21.  Thus, the Court infers that the log book would have confirmed that Kling was pushing the barge at the time of Ayala's fall and would not have supported Kling's testimony that the barge was not moving when the accident occurred.

22.  However, Bridge is only responsible for its own negligence and not for the negligence of Hughes or Tutor Perini that contributed to Ayala's damages.  While there is no credible

evidence of negligence on the part of Hughes, there is ample
evidence of negligence on the part of Tutor Perini.

23.  Tutor Perini is liable for any negligence of Hughes.
Hughes chartered the HUGHES 660 to Tutor Perini pursuant to the
Hughes-Tutor Perini Bareboat Charter Party Agreement dated
November 19, 2010.  See Tutor Perini Trial Ex. B. Perini
assumed, from Hughes, the full responsibility for the vessel,
including its maintenance and operation.  "The effect of the
bareboat charter party arrangement is that a charterer is
considered the owner of the vessel *pro hac vice*."  Uni-Petrol
Gesellschaft Fur Mineraloel Produkte M.B.H. v. M/T Lotus Maru,
et al., 615 F. Supp. 78, 80 (S.D.N.Y. 1985) (citing The Yaka,
373 U.S. 410 (1963)).  "The liability of the ship owner is
limited: '. . . An owner who has demised his ship is not indeed
liable to anyone but the demisee under his warranty of
seaworthiness for any loss or injury suffered during the demise.
Such liabilities sound in contract and he has not made any
contract with anyone else.'"  Id. at 81 (quoting Cannella v.
Lykes Bros. S.S. Co., 174 F.2d 794, 796 (2d. Cir. 1949)).

24.  "The standard of seaworthiness 'is not to suggest that the
owner is obligated to furnish an accident-free ship. The duty is
absolute, but it is a duty only to furnish a vessel and
appurtenances reasonably fit for their intended use. The

standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.'"  Bridge I, 39 F. Supp. 3d at 385 (quoting Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960)).

25.  There is no evidence that the HUGHES 660 was unseaworthy or that any act or omission of Hughes caused or contributed to Ayala's damages.  While there were dents in the decking, there is no evidence that those dents contributed to Ayala's fall. Moreover, there is no evidence that there were any dents near the edge of the vessel where Ayala fell or that ice accumulated in that area because of any defects in the deck at that point.

26.  Tutor Perini was negligent and its negligence was a cause of Ayala's fall.  Tutor Perini was negligent in providing an inexperienced deckhand to tie the HUGHES 660 to the dolphins on the date in question after being alerted to Ayala's unsuitably for the task after Ayala had fallen into the Hudson River the day before the December 15, 2010 incident.  Tutor Perini was also responsible for the negligence of Ayala, its agent, which contributed to Ayala's injuries.  In particular, (1) Ayala knowingly disregarded his training to stay clear of the edge of the barge while it was still in motion and fell off the barge as

a result; (2) Ayala failed in his obligation to remove ice or
remedy a known slippery condition from the barge and fell off
the barge as a result; (3) Ayala was not properly trained to
remove ice from the deck of the barge and fell because of an icy
condition; (4) Ayala failed to advise anyone at Tutor Perini of
icy conditions; and (5) Tutor Perini failed to keep the barge
free of a known icy condition or slippery surface and required
Ayala to work despite that condition.  Therefore, Tutor Perini's
negligence was a substantial cause of Ayala's damages.

27.  Tutor Perini argues that any negligence on the part of
Ayala should not be taken into account in the Court's assessment
of the proportionate share of fault of Bridge, on the one hand,
and Hughes and Tutor Perini, on the other hand.  Tutor Perini
argues that the parties have already taken Ayala's comparative
fault into account in their decision to settle with Ayala.
However, there is no evidence and no way to determine how, if at
all, the parties have already taken Ayala's fault into account
when they determined the amounts they paid to Ayala.  The only
measure of damages is the amounts that Bridge and Tutor Perini
have paid to Ayala. Therefore, the comparative fault of Ayala
should be part of the comparative fault that is attributed to
Tutor Perini, Ayala's employer.

28.  Tutor Perini also argues that, to the extent that the Court determines that Ayala's proportionate share of fault should be taken into account, any such fault on the part of Ayala should be attributed to Bridge in view of the fact that Ayala was a deckhand who was being directed by Kling during the course of the barge-shifting maneuver at the time of Ayala's fall. However, Tutor Perini cites no authority for ignoring vicarious liability pursuant to which Tutor Perini is liable for the acts and omissions of Ayala, its employee, in the course of his employment.  Therefore, the negligent acts and omissions of Ayala are attributed to Tutor Perini in determining the total amount of fault attributed to Tutor Perini.

29.  Pursuant to Section 11.1 of the Tutor Perini-Bridge Subcontract, Bridge is required to indemnify Tutor Perini for the liability caused by Bridge's negligence but not for any liability caused by Tutor Perini's negligence.  The sum already paid to Ayala is for the total amount of damages he suffered, in the amount of $794,448.97.  The Court concludes that Bridge's negligence caused 40% of Ayala's damages and Tutor Perini's negligence caused 60% of Ayala's damages, namely $476,669.38. Because Tutor Perini already paid an amount exceeding its percentage of fault, Bridge is required to indemnify Tutor Perini for the excess damages Tutor Perini paid to Ayala, namely

$62,779.59.   Accordingly, Bridge shall pay Tutor Perini
$62,779.59.   Then, Tutor Perini will have paid damages in the
amount of $476,669.38 and Bridge will have paid $317,779.58.

30.  Bridge has sought indemnification from Tutor Perini
pursuant to Change Order No. 001 to the Tutor Perini-Bridge
Subcontract.   However, Bridge concedes that it would be entitled
to contractual indemnification from Tutor Perini under Change
Order No. 001 only if Tutor Perini was *solely* negligent.
Because Ayala's injuries did not arise solely out of the
negligent acts or omissions of Tutor Perini or its personnel or
invitees, Bridge is not entitled to any indemnification from
Tutor Perini.[2]

---

[2] The result is the same under Bridge's claim for common law
indemnification from Tutor Perini.  Under principles of
comparative negligence under maritime law and New York law,
Tutor Perini is only liable for its share of Ayala's damages
based on its comparative fault.  See, e.g., Williams v. United
States, 712 F. Supp. 1132, 1135 (S.D.N.Y. 1989); Shanahan v.
Orenstein, 383 N.Y.S.2d 327, 331 (App. Div. 1976); see also
Cent. Hudson Gas & Elec. Corp. v. The TUG M/V SCOTT TURECAMO,
496 F. Supp. 2d 331, 351 (S.D.N.Y. 2007) ("Both New York law and
federal maritime law employ a pure comparative negligence
standard, apportioning loss in direct proportion to the degree
of fault.").

**CONCLUSION**

Bridge is required to pay **$62,779.59** in damages to Tutor Perini.[3]

The Clerk is directed to close all open motions.

Tutor Perini is directed to submit a proposed Judgment by **May 18, 2016**.  Bridge may submit any responsive papers by **May 20, 2016**.

**SO ORDERED.**

**Dated: New York, New York**
        **May 12, 2016**

_____/s/_____
        **John G. Koeltl**
**United States District Court**

---

[3] The Court has previously determined that Bridge is required to pay Tutor Perini's defense costs, including attorneys' fees, under Section 11.3 of the Tutor Perini-Bridge Subcontract.  See Bridge II, 2015 WL 6437562, at *8.